IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KIARI SWAIN, #312546           *
          Plaintiff,
     v.               *    CIVIL ACTION NO. DKC-11-2623

COLIN OTTEY, *et al*.         *
          Defendants.
                 ***

**<u>MEMORANDUM OPINION</u>**

I.    PROCEDURAL HISTORY

      Kiari Swain ("Swain"), a state inmate, filed this civil rights Complaint seeking compensatory damages and observation in the prison infirmary or an outside medical center. He claims that when he originally complained about a rash on his genitalia in August of 2010, he was seen by a nurse, not by a physician's assistant ("P.A.") or a physician.   He further contends the nurse referred him to a P.A., who was not working full time and his "penis began to hurt really bad" as it was weeks before he was seen by a P. A.   Swain claims he submitted over a dozen sick-call slips through the next six months, but was not seen by a doctor until January of 2011.   He maintains the physician admitted him to the prison dispensary for three days on "close observation," and he was to be provided clotrimazole (anti-fungal medication) and "doxy tylenol #3," with catheterization as needed due to his difficulty voiding.   Swain complains that after his release from the infirmary he again reported to a P.A. that he was unable to urinate and was returned to the infirmary.  He claims that on February 3, 2011, he was seen by the urologist, who suggested that Swain had a urethral stricture and that he receive a "cold knife internal urethrotomy"[1] at the Bon Secours Hospital ("BSH") Outpatient Surgical Center.   Swain alleges he had the procedure at BSH on March 14, 2011, and was told by the surgeon that he should be

---

[1]    Urethrotomy or cystoscopy is a surgical method for relieving a stricture of the urethra. www.usadelaware.com/medical_briefs/cystoscopy_and_optical_internal_urethrotomy.

returned to BSH in three weeks, but as of the August 2, 2011 preparation of his Complaint, he had not received this follow-up care.  (ECF No. 1).

Swain alleges he is beginning to have the same problems regarding difficulty in voiding, and in addition, he is urinating blood and has infrequent bowel movements.  He contends that he submitted emergency sick-call requests or spoke to medical personnel numerous times during the months of June and July, 2011, and he was never examined or given medical care with the exception of unspecified medication.   He claims that he is urinating blood and is in severe pain. (*Id*.).

In his Supplemental Complaint Swain reiterates his original claims.   He acknowledges a catheter was inserted and he was sent to the prison infirmary on September 7, 2011, at which time he was ordered pain medication by Dr. Manger.   (ECF No. 7).   He complains that he still has difficulty voiding urine, that there is blood when he is able to void, and he is in extreme pain. (*Id*.).    After review of the court-ordered show cause response submitted by counsel for Defendants Colin Ottey, M.D., Greg Flury, P.A., Carla Buck, R.N., Monica Methany, R.N. Steven Bray, R.N. Michele Schultz, R.N. Dawn Hawk, R.N., Angela Africa, L.P.N., Kelly Flinchman, L.P. N., R. Skidmore, ADON, Vikki Ward, L.P.N., Renea Bittner, L.P.N, and Lisa Schindler, P.A ("Medical Defendants"), on October 21, 2011, emergency injunctive relief was denied by the undersigned.[2]   (ECF Nos. 10 & 11).

Swain filed a Second Supplemental Complaint on November 14, 2011, claiming that on September 27, 2011, he was taken to a prison medical unit because he again could not urinate.

---

[2]        Medical Defendants submitted Swain's medical records with their response.  The records showed that Swain received ongoing medical care for his recurring urological condition.  Efforts to treat the condition included medication, catheterization, a urological consultation, surgery, and admissions to the prison infirmary for observation and treatment.  Defendants dispute Swain's claim that he was denied post-surgery follow-up with his surgeon.  (ECF No. 3 and ECF No. 9 at Ex. B at 275-277). Since October 6, 2011, Swain has been receiving medication for his recurring symptoms, and a course of treatment prescribed by Dr. Ottey after conferring with Swain's surgeon.

(ECF No. 12).  He contends that Dr. Ottey attempted to insert a catheter into his penis, but encountered a blockage.  (*Id*). Swain complains that Nurse Carla Buck then attempted to insert the catheter "real hard, causing him excruciating pain" and would not stop even after he repeatedly asked her to cease her efforts.  He alleges that he was given no pain medication and was urinating blood after the incident.   He seeks punitive damages and transfer to a more adequate medical facility.[3]

II.    PENDING MOTIONS

Currently pending are the Medical Defendants' Motion to Dismiss, or in the Alternative Motion for Summary Judgment, Swain's Opposition, and the Medical Defendants' Reply.  (ECF Nos. 15, 17, & 18).   The undersigned has examined the medical records and exhibits submitted by the parties and finds that no hearing is necessary.  *See* Local Rule 105.6. (D. Md. 2011).  For reasons to follow, Defendants' paper, construed as a motion for summary judgment, shall be granted.

III.    STANDARD OF REVIEW

Under revised Fed. R. Civ. P. 56(a):

> A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.   In *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[3]      Attached to the Complaint is a form for filing a Complaint under the Americans with Disabilities  and  Rehabilitation Acts.  At no time does Swain reference his disability except to state that Ottey and Buck have called him a "retard" and laughed at him due to his "mental disability."  (ECF No. 12 at 5).  He has not shown, much less claimed that he was denied medical care due to a disability.

242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the"judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252. The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla"of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

This Court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citation omitted). Indeed, the Court has an affirmative obligation to prevent

factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humpreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

IV.    DISCUSSION

1.    Facts

According to the Medical Defendants, Swain has a history of asthma, hypertension, and psychotic disorders.   He filed sick-call slips from August to December of 2010 and in February of 2011 complaining of a genitalia rash, blood when voiding, and difficulty in urinating.  (ECF No. 9 at Ex. B-4, 34-37 & 39-48).   He was seen by medical staff in October of 2010, and his condition was assessed as related to a urinary tract infection.  (*Id*., at Ex. B-49-50).  A urinalysis was ordered on November 4, 2010, and follow-up care was ordered for his report of blood in his stool.  (*Id*. at Ex. B-51-53).  Occult blood stool cards were given to Swain on November 13, 2010.  (*Id*. at Ex. B-54-55). In December of 2010, he was seen for his complaint of genital bumps and burning when voiding.   No evidence of infection was noted and there were no open areas or drainage noted on his penis.  He was assessed with cellulitis or an abscess and given doxycycline, a tetracycline antibiotic, along with a topical triple antibiotic and Ibuprofen.  (*Id*. at Ex. B-56-61).  Swain was again seen on January 9, 2011, for complaints of difficulty in urinating and the worsening of his condition with oral and topical antibiotics.  Upon physical examination, his bladder was found to be non-distended and his penis and scrotum were swollen with reddened areas.  A catheter was inserted without resistance.  (*Id*. at Ex. B-62-63).  Swain was prescribed Cipro, an antibiotic, and told to drink 9 to 10 glasses of water daily.  Later that day he was able to urinate normally and provided a sample for diagnostic testing.  A test strip was negative/normal.  (*Id*. at Ex. B-65).  On January 11, 2011, however, he was admitted to the

prison infirmary for close observation.  Dr. Getachew scheduled a plan to give Swain Tylenol for pain, to apply Clotrimzole to the affected area of the penis, and to utilize intermittent catheterization if Swain was unable to urinate on his own.  (ECF No. 9 at Ex. B-66-69).

On January 11, 2011, Dr. Ottey placed Swain on medical hold, thus limiting his activities, directed that his Foley catheter be maintained, and continued him on his medications, which  included Doxycycline, Tylenol and anti-fungal cream.  The following day, Ottey placed an "indwelling" catheter[4] in Swain.  (*Id.* at Ex. B-70-73).

Over the course of the next several days, Swain was observed to have normal urinary output.  His genital area, however, appeared edematous (had an accumulation of fluid) with no visible discharge.  His stool sample was negative for occult blood.  On January 13, 2011, Swain reported that the "pressure" was gone and he felt he could urinate on his own.  (*Id.* at Ex. B-75-84).  Penile swelling had gone down.  The catheter was removed and he was discharged from the infirmary that same date with noted improvements.  (*Id.* at Ex. B-85-92).

On January 14, 2011, Swain appeared at sick call complaining that he was unable to urinate without the catheter and that he felt painfully bloated.  P.A. Schindler noted that Dr. Getachew suggested sending Swain back to the infirmary unless he went to the urologist for dilation evaluation. (*Id*. at Ex. B-93-94).  He was readmitted to the infirmary that day to await a urology evaluation.   A catheter was inserted and Swain's urinary output was monitored.   (*Id*. at Ex. B-95-100).   He remained in the infirmary, where he received pain medication, Benadryl for itching, topical cream for itching (miconazole nitrate), and was placed on a "bladder training schedule."  (*Id*. at Ex. B-101-169).   On January 22, 2011, Dr. Ottey verbally ordered that the

---

[4]         An indwelling catheter is one that is left in the bladder.  It collects urine by attaching to a drainage bag.  *See* www.nlm.nih.gov/medlineplus/ency/article/003981.htm

catheter be removed for 24 hours and that Swain's urinary output be monitored.   (*Id*. at Ex. B-170-179).   By January 24, 2011, Swain indicated that he had no pelvic pain and was urinating without difficulty.   (ECF No. 9 at Ex. B-180-189).   He was released from the infirmary on January 24, 2011.   (*Id*. at Ex. B-183).   He saw Dr. Allaway, an urologist, on February 3, 2011, who suggested that Swain had a urethral stricture and that he be scheduled for a cold-knife urethrotomy at an outpatient surgical center.   (*Id*. at Ex. B-192-200).   He was subject to pre-operative physical evaluations, had blood work ups completed, and received the cystoscopic procedure at BSH on March 14, 2011.   Dr. Lawrence Scipio, the surgeon, observed that there was "noted trauma at the level of the bulbar urethra with scarring, but there was no stricturing of the urethra." (*Id*. at Ex. B-201-229).   He was diagnosed with Prostatitis and urethral trauma and stricture and discharged to the infirmary at the Jessup Correctional Institution.   By March 16, 2011, he acknowledged he was feeling better and was receiving Cipro, Pyridium,[5] and pain medication.  (*Id*.).

On March 28, 2011, he submitted a sick-call request complaining of a rash on his penis. He was seen by healthcare personnel for multiple requests on April 1, 2011.  When seen, he informed medical staff that his bumps had cleared up.   (*Id*. at Ex. B-236-238).   He later complained that he again had difficulty urinating.  He was seen by medical staff and a urinalysis and Trichomoniasis[6] culture were ordered.   (*Id*. at Ex. B-239-241 & Ex. B-244-250).

---

[5]     Pyridium or Phenazopyridine relieves urinary tract pain, burning, irritation, and discomfort, as well as urgent and frequent urination caused by urinary tract infections, surgery, injury, or examination procedures. *See* www.nlm.nih.gov.

[6]     Trichomoniasis is a parasitic infection of the urethra which may cause pain when urinating.  *See* Stedman's Medical Dictionary 1872 (27th Ed. 2000).

In June, 2011, Swain was seen for complaints related to dysuria, with subjective lower abdominal pain.  (*Id*. at Ex. B-251-257).    From July 3 to July 5, 2011, he complained of a "tumor" in his bladder blocking the flow of urine through his urethra.   He was seen by medical personnel and as of July 13, 2011, claimed that the dysuria had improved and that he was adequately urinating, with no abdominal pain. (ECF No. 9 at Ex. B-258-267).  On July 31, 2011, he again complained of problems going to the bathroom and subsequently noted that there was blood in his urine and stool.   A urine reagent strip was within normal limits for all tests and negative for blood.  He was seen by healthcare personnel for dysuria and hematuria over the course of the following week   (*Id*. at Ex. B-269-285).

On September 7, 2011, Swain was admitted to the prison infirmary by Dr. Ottey for a urethral stricture.  He was catheterized and drained clear yellow urine.  Swain was also provided pain medication as needed.  His vital signs were all within normal limits.   (*Id*. at Ex. B-291-300).  On September 12, 2011, the catheter was removed and Swain was discharged from the infirmary.    (*Id*. at Ex. B-301-312).   He was seen two days later and acknowledged that his urinary symptoms had improved.   On September 21, 2011, he reported to Dr. Ottey for a follow-up of his urethral problems and reported that he was having difficulty urinating.   His condition was discussed with the urologist, who opined that his intermittent inability to urinate was likely due to a neurogenic bladder.[7] He recommended treating Swain with Flomax for one month and then re-evaluating him.  (*Id*. at Ex. B-313-323).   On September 27, 2011, he appeared at sick call on an "urgent" visit due to acute bladder pain.   He was admitted to the infirmary after

---

[7]        A neurogenic bladder is a condition where the central nervous system does not deliver the appropriate neurological signals to the muscles which comprise the bladder resulting in the inability to urinate as needed.  See www.nbci.nlm.nih.gov/pubmedhealth/POMH0001761/.

attempts to insert a catheter were unsuccessful.  When voiding Swain had a clear yellow urine output.  (*Id*. at Ex. B-324-338).

Medical Defendants repeatedly affirm that Swain has at best articulated a disagreement with a prescribed course of treatment, which is not actionable under the Eighth Amendment. They argue that the records show he received prompt examination upon his sick-call requests for medical attention and was seen by the appropriate medical personnel.   (ECF No. 15).

In his Opposition, Swain initially sites to caselaw in support of his argument of an Eighth Amendment deprivation.    (ECF No. 17).   His memorandum acknowledges that he received a cystoscopy at BSH, but he claims he did not return to the hospital for follow-up appointments as ordered.    (ECF No. 17).    Swain asserts that his complaints of ongoing pain and difficulty urinating were met with a delayed medical response and/or no medical care whatsoever.   He further affirms that most of the time when a physician or nurse attempted to put a catheter into him, it was done without pain medication.   (*Id*.).   He maintains that he was not treated as a patient, but as a "nuisance."   In their reply, the Medical Defendants argue that a reasonable fact finder could not view the undisputed course of treatment as rising to an Eighth Amendment violation.   (ECF No. 18).

2.      Legal Analysis

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991).   In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their

failure to act amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).  Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition.  *Farmer*, 511 U.S. at 839-40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."  *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).  "Actual knowledge or awareness on the part of the alleged inflicter…becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844.  If the requisite subjective knowledge is established, an official may avoid liability  "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *Brown* 240 F. 3d at 390; citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F. 3d 164, 166 (4ᵗʰ Cir. 1998).  Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present.  *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

The Complaint against the Medical Defendants fails.   The record shows that while Swain was not treated as promptly as he would have liked, he was routinely examined by  nurses, P.A.s, and physicians, who consulted with specialists; had numerous diagnostic urine and blood tests; was repeatedly subject to catheterization procedures and placed in the infirmary for observation and care; and had a cystoscopic procedure at a local hospital.   Further, he was prescribed antibiotics, Flomax, topical ointments, and pain medication as needed.   The care he received was far from cursory.   His complaints of difficulty in urinating, bladder pain, and blood in his urine and stool were addressed by medical personnel, albeit in a conservative manner.   There is no showing that any delays in treatment caused Swain to suffer a permanent loss or that he was otherwise detrimentally affected by the interruption in care.    His disagreement with the exhaustive testing and treatment he received does not constitute an Eighth Amendment violation.[8]

---

[8]        In light of this decision, Swain's attempt to amend his Complaint to raise claims under the American's with Disabilities ("ADA")  and Rehabilitation Acts ("RHA") shall be denied.  Title II of the ADA, 42 U.S.C. § 12131, *et seq.*, prohibits qualified individuals with disabilities from being excluded from participation in or being denied the benefits of the services, programs or activities of a public entity.  Cases interpreting the language of the ADA and that of the RHA have concluded that the applicable legal tests created by these statutes are interchangeable. *See Calloway v. Boro of Glassboro Dep't of Pol.,* 89 F.Supp.2d 543, 551 (D. N.J. 2000). To state a claim for violation of either the RHA or the ADA, the plaintiff must show that (s)he (1) has a disability, (2) is otherwise qualified to participate in a program, and (3) was denied the benefits of the services or discriminated against because of the disability.    *See Millington v. Temple Univ. Sch. Of Dentistry*, 261 Fed. App. 363, 365 (3ʳᵈ Cir. 2008).  A condition may qualify as a "disability" within the meaning of the ADA and RHA because it "substantially limits one or more ... major life activities." 42 U.S.C. § 12102; 29 U.S.C. § 705(20)(B).  Under the law in this circuit, to

V.  CONCLUSION

For the aforementioned reasons, the Court finds no Eighth Amendment violations.

Defendants' Motion, construed as a motion for summary judgment, shall be granted.   A separate

Order follows.


Date:   September 4, 2012                          /s/
                                      DEBORAH K. CHASANOW
                                      United States District Judge

---

establish that he is disabled under the ADA, Swain must prove that: he has a physical or mental impairment; that this impairment implicates at least one major life activity; and the limitation is substantial. *See Heiko v. Columbo Savings Bank, F.S.B.*, 434 F.3d 249, 254 (4th Cir. 2006). He has not met this criteria, much less shown that he was denied care on the basis of his mental health.